Lucille MORRIS, Executrix and I. I. Ozar and Max W. Foust, Executors of the Estate of William S. Morris, Deceased, Respondents-Appellants,

v.

DEL E. WEBB CORPORATION, Appellant-Respondent.

No. WD 31336.

Missouri Court of Appeals, Western District.

May 4, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1981.

Application to Transfer Denied July 14, 1981.

**544**

Max W. Foust, E. Wayne Taff, Morris & Foust, Kansas City, for respondents-appellants Foust and Ozar.

James F. Duncan, Leonard Singer, Watson, Ess, Marshall & Enggas, Kansas City, for appellant-respondent Del E. Webb Corp.

Before DIXON, P. J., WASSERSTROM, C. J., and NUGENT, J.

NUGENT, Judge.

These are cross appeals on behalf of plaintiffs Lucille Morris, et al., and defendant Del E. Webb Corporation from the amended judgment of October 25, 1979, awarding the plaintiffs the sum of $20,000.00 plus interest in the sum of $1,800.00. The plaintiffs appeal the amount of the award and the amount of interest; the defendant appeals the judgment itself. We reverse the judgment and remand the case to the trial court with directions to reinstate its earlier award of the principal amount due on the contract and to recalculate the interest due.

On July 26, 1976, the plaintiffs, executrix and executors of the Estate of William S. Morris, filed this action for damages for breach of contract. The petition alleged that the Del E. Webb Corporation had failed and refused to pay Morris for his services under a contract of January 15, 1975, to assist Webb in securing a construction contract with the Aladdin Hotel in Las Vegas, Nevada. In its answer Webb alleged that Morris had died before performing under this contract and the subsequent contract between Webb and the Aladdin Hotel, entered into after Morris' death, was a bid contract rather than the anticipated negotiated contract. Therefore, Morris performed no negotiation and was not entitled to any compensation.

Trial was held on August 8, 1979. Finding that the Morris-Webb contract was basically a finder's fee agreement, the court on the same day entered judgment for the plaintiffs in the sum of $67,532.50 plus interest in the sum of $1,800.00. Pursuant to Rule 73.01(1)(c)[1], Webb filed its motion to amend judgment. Thereupon, the court amended the judgment, lowering it to $20,000.00 plus interest. The plaintiffs filed a motion to vacate or in the alternative to strike the court's latter findings. On October 25, 1979, the trial court overruled this motion, reiterating its amendment of the judgment reducing the award to $20,000.00 plus interest of $1,800.00. Both parties filed timely appeals.

The judgment of the trial court finding that Morris performed under the finder's fee contract is affirmed under the command of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. en banc 1976). We find, however, that an award in the amount of $20,000.00 plus interest of $1,800.00 was not supported by the evidence.

Late in 1974 officers of Webb, an Arizona construction contractor, became aware of the fact that the Aladdin Hotel in Las Vegas was proposing construction of a large addition. Webb also learned that Sorkis Webbe of St. Louis, Missouri, was the owner or nominee of the owner of the Aladdin and "was the man to see and talk to" about the project. Therefore James R. Comer, a vice president of Webb who had been in Kansas City during the time when Webb had been involved in major construction projects there, contacted Kansas City acquaintances for the name of a person who could introduce the Webb Corporation to Webbe. William Morris[2], a Kansas City

---

1. Now Rule 73.01(a)(3).

2. This court takes judicial notice of the fact that Mr. Morris was Lieutenant Governor of the State of Missouri from 1969 to 1973 and well known throughout the state.

attorney whom Comer had met socially in the late 1960's, was suggested as someone who knew Webbe very well.

Comer called Morris from Arizona. When Morris indicated his willingness to act for Webb, Comer and another representative of Webb met Morris in his Kansas City law office. They discussed a fee arrangement at that time but concluded no agreement. Subsequently, Comer returned to Arizona and obtained authority from William Collins, his superior, to negotiate a fee with Morris.

A conference call between Morris, in Kansas City, and Comer and Collins, in Arizona, generated a December 30, 1974, letter from Webb to Morris which proposed in its paragraph 1 a graduated finder's fee for Morris. The basic fee was to be $10,000.00 if Webb's "fee" (profit) ranged between 3½ % to 4%. Apparently, if Webb made a profit of less than 3½%, Morris was to get no fee at all. Paragraph 2 of the letter made the latter proposal more explicit by proposing that Morris would be due no fee unless Webb contracted with Aladdin's owner "at a price which contains a fee of at least 3½% of the estimated cost of construction of the project." Morris rejected those terms and proposed instead that the first stage of his fee be based upon the mere execution and entrance into a construction contract. After further telephonic negotiation, an agreement was reached which was reduced to writing in the form of a letter dated January 15, 1975, and signed on that date.

The relevant provisions of the Morris-Webb contract are:

We propose to enter into a "finder's fee" agreement with you (sometimes hereinafter referred to as "Morris") concerning a proposed approximately 700 room addition to and expansion of casino area at the Aladdin Hotel, Las Vegas, Nevada, on the following terms and conditions:

1. In the event Del E. Webb Corporation (sometimes hereinafter referred to as "Webb") should be awarded and enter into a contract with Sorkes [sic] J. Webbe (Reputed Owner or nominee of same) for the construction of the above addition ... we would agree to pay you for your services as a finder and for assistance in negotiation of a contract, a fee determined as follows:

| Webb Fee | Morris Fee |
|---|---|
| (a) If 0% to 4% of such Estimated Cost | Straight $10,000 |
| (b) If 4% to 4-½% of such Estimated Cost | Amount equivalent to that portion of Webb Fee in excess of 4% of Estimated Cost but in no event less than $10,000 |
| (c) In excess of 4-½% | Amount equivalent to that determined by (b) above plus an amount equivalent to 50% of that portion of Webb Fee in excess of 4-½% of estimated cost of construction. |

2. .... Webb will not in any way be obligated to enter into any construction contract not satisfactory to it. No fee will be earned by Morris unless Webb does enter into a construction contract with Owner or nominee of Owner.

3. In the event a satisfactory construction contract to Webb is negotiated and entered into with Owner or nominee, the fee to be paid to you as a consequence of this agreement will be paid to you in six (6) equal monthly installments commencing on the date when Webb is paid its third construction draw.

Before the signing of the contract, Morris met Webbe in Las Vegas on January 15, 1975, to discuss Webb's reputation in Kansas City and to introduce Webbe to Webb's representatives. Apparently, on the basis of Morris' recommendation, Webbe guaranteed Webb an opportunity to estimate or bid on the job. After this meeting, Webb employees worked with Aladdin's architect to prepare an estimate of the job.

On January 26, 1975, Morris entered a Kansas City hospital. He remained there until his death on March 5, 1975.

Webb submitted a bid on March 25, 1975, along with two other bidders. Although

this bid was rejected as being too high, Aladdin thereafter worked exclusively with Webb until May 8, 1975, when they entered into a written construction contract for $17,885,000.00 with an option given to Aladdin to secure additional work for $2,250,-000.00. Aladdin later exercised the option, and Webb performed that work. An additional contract between Webb and Aladdin for a concourse was entered into on February 25, 1976, for $752,078.00 which was later increased to $830,270.00 because of change orders before completion.

Webb's position is that the Morris-Webb contract required Morris to perform two functions to earn his fee: act as finder *and* assist in the negotiation of a contract between Webb and Aladdin. Further Webb argues that the parties intended that the subsequent Webb-Aladdin contract would be a "negotiated" contract and not a "bid" contract, a distinction that Webb maintains is well established in the construction industry. Webb concludes that since Morris died before the Webb-Aladdin contract was entered into and the Webb-Aladdin contract was a "bid" contract, Morris was not entitled to any fee.

Morris contends that the Morris-Webb contract only required Morris to use his influence with Webbe to give Webb a chance at the Aladdin contract. Moreover, Morris did assist in negotiations with Webbe when Morris arranged the January 15, 1975, meeting in Las Vegas and recommended the Del Webb Corporation to Webbe. Morris challenges the Webb assertion that the resulting Webb-Aladdin contract was not "negotiated", pointing to evidence that the original bids due on March 25 were by invitation only and evidence that between March 25 and May 8, 1975, Aladdin dealt only with Webb.

Each party relies on a phrase or word in the Morris-Webb contract to support its position that the terms are clear and unambiguous. Such disagreement does not itself make the terms of the contract ambiguous. *Mickleberry's Food Products Co. v. Haeus-*

*sermann,* 247 S.W.2d 731 (Mo.1952). In such a situation, the question is to be decided by the court as a matter of law. *Commerce Trust Co. v. Howard,* 429 S.W.2d 702 (Mo.1968). The trial court found the Morris-Webb contract to be basically and primarily a finder's fee contract. We hold that finding to be supported by the evidence.

In *Wilshire Construction Co. v. Union Electric Co.,* 463 S.W.2d 903 (Mo.1971), the Supreme Court of Missouri gave the following directions at 906:

We look first at the cases expounding the rules for the construction of unambiguous contracts. The courts seek to ascertain the intent of the parties by giving to the language used *its natural, ordinary, and common sense meaning, but they also* look to the entire contract; and the court should consider the object, nature and purpose of the agreement. . . . [T]he spirit, purpose and substance of the agreement must control rather than its letter . . . . (Emphasis added; citations omitted.)

The court found and the evidence was that the intent of the parties was that Morris introduce Del Webb's people to Sorkis Webbe and put Webb in a position to obtain the construction contract. That intent was made clear by the fact that even if the resultant contract were not profitable, Morris would have earned a fee of $10,000.00. The court also found and the evidence showed that Morris acted as a finder and negotiated with Webbe when, in the course of arranging and attending the meeting in Las Vegas, he introduced and recommended the Del Webb Corporation to Webbe [3].

█ Webb maintains, however, that, if Morris earned a fee, it must be calculated on the basis of the actual net profit realized by Webb on the Webb-Aladdin contract and option of May 8, 1975, totaling $20,135,-000.00. That actual profit was $723,773.00, which is only 3.75% of the estimated cost of $19,295,000.00. Figured that way, the Morris fee would only be $10,000.00 under paragraph 1(a) of the Morris-Webb contract.

---

3. The trial court also correctly found that it made no difference under the *Morris-Webb* contract whether the construction contract was negotiated or bid.

Morris argues that since paragraph 3 of the Morris-Webb contract required Webb to pay Morris before the project was completed, the Webb fee had to be calculated on the basis of estimates—the estimated cost of $19,295,000.00 and the estimated profit of $840,000.00 (contract price $20,135,000.00 less $19,295,000.00). $840,000.00 is 4.35% of the estimated cost. Multiplying $19,295,-000.00 by .0035, the amount in excess of four percent, gives Morris a fee of $67,-532.50 under paragraph 1(b) of the contract. The trial court originally used these figures in awarding the judgment. The judgment was later amended to $20,000.00.

We hold that the trial court erred in amending the original judgment. The manifest intent of the parties that Morris'. fee be based on the estimated profit appears in paragraph 3 of the contract, which set up a schedule for the payment of Morris' fee in six equal monthly installments to begin long before completion of the work. That clause can only refer to estimated profits (the Webb "fee") because the parties could not have known the amount of Webb's actual profits before the completion of the project. Therefore, under the contract, Morris accrued a fee of $67,532.50 when the contract was entered into on May 8, 1975.

Finally, Morris appeals the judgment of the trial court awarding interest on $10,-000.00. The petition alleged damages under the contract "in the sum of at least $10,-000.00." When the petition was filed, plaintiffs did not have access to the information necessary to calculate any additional fee due Morris. Pretrial discovery and the trial revealed the figures upon the basis of which the trial court correctly calculated the final fee at $67,532.50. The prayer of the petition sought judgment "for that amount which is due as determined by the terms of the contract, said amount being in the sum of at least $10,000.00, with interest thereon from the date of" the alleged breach of the contract. Under the circumstances, the prayer was adequate to seek all accrued damages, not just $10,000. A fortiori, interest on the total amount of the judgment should also have been awarded.

Accordingly, the judgment entered on October 25, 1979, is reversed and the cause is remanded to the trial court with directions to reinstate its judgment of August 8, 1979, to the extent that it awards plaintiffs the principal sum of $67,532.50. The trial court is further directed to amend the August 8, 1979, judgment after calculating the interest due thereon at the statutory rate[4] from the date it became due and payable under the terms of the written contract. The first of the six equal payments due Morris was "on the date when Webb [was] paid its third construction draw." § 408.020, RSMo Supp.1980; *Doerflinger Realty Co. v. Fields*, 281 S.W.2d 609, 613 (Mo.App.1955); *Larson v. Crescent Planing Mill Co.*, 218 S.W.2d 814, 821–22 (Mo.App.1969).

All concur.

---

4. Six percent was the legal rate of interest effective at the time the fee became due. § 408.020 RSMo 1978. Effective September 28, 1979, the rate was increased to nine percent.

§ 408.040 RSMo Supp.1980; *State ex rel. Utility, etc. v. Public Service*, 602 S.W.2d 852 (Mo. App.1980).